

POSTED ON WEBSITE

## NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | ) Case Number 08-13720-B-7 |
| | ) |
| George F. Andersen and | ) |
| Tacy Andersen, | ) |
| | ) |
| Debtors. | ) |
| ———————————————— | ) |
| | ) |
| Mountaineer Investments, LLC, | ) Adversary Proc. No. 08-1216 |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| George F. Andersen and | ) |
| Tacy Andersen aka Tacy Gould, | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

**MEMORANDUM DECISION REGARDING COMPLAINT
TO DETERMINE DISCHARGEABILITY OF DEBT**

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

Templeton Briggs, Esq., of Brewer & Brewer, appeared on behalf of the plaintiff, Mountaineer Investments, LLC.

Defendants, George F. Andersen and Tacy Andersen appeared *in propria persona*.

Before the court is an adversary proceeding filed by Mountaineer Investments, LLC ("Mountaineer") for a money judgment and to determine the dischargeability of a debt owed by defendants, George and Tacy Andersen

("Andersens"). Mountaineer contends that the Andersens obtained a loan for $165,000 from Mountaineer's predecessor in interest, Exclusive Investments Ltd. ("Exclusive"), through fraud and the use of a materially false written credit application. The debt was secured by a lien against the Andersens' home (the "Residence"). The Andersens contend that the debt was structured such that it could only be repaid from a subsequent refinance or sale of the Residence. Because Mountaineer has failed to prove, *inter alia*, that Exclusive relied on any representation or financial information given by the Andersens, judgment will be entered in favor of the Andersens and the debt will be discharged.

This memorandum contains findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. The bankruptcy court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 523[1] and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

**Background and Findings of Fact.**

In 2006, Tacy Andersen (formerly Tacy Gould: hereafter "Tacy") owned and operated a health spa franchise known as Butterfly Life. Tacy was also a licensed real estate broker. Tacy and her husband owned the Residence located in Prather, California.[2]

---

[1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated on or *after* October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

[2]Tacy was the only defense witness. Mr. Andersen was present but did not testify at trial. It is not clear from the record how much, if any, involvement Mr. Andersen had in any of the negotiations and events leading up to litigation, other than the fact that he apparently signed the relevant documents.

In early 2006, Butterfly Life was struggling financially. The Andersens were using personal assets to support the business and Tacy began looking for a source of financing for operating capital. She submitted loan applications to about two dozen potential lenders, but was unsuccessful for various unstated reasons. Finally, in late 2006, she was contacted by two individuals, Dino Mora ("Mora") and Henry Berliner ("Berliner") who told her they could put together a financing package for the business to be secured by the Residence.[3] After numerous emails and communications, a loan package was offered to the Andersens in the face amount of $165,000 (the "Loan").

At one point in the process, Mora told Tacy that he needed confirmation that the purpose of the Loan was to provide funds for Butterfly Life. In response, Tacy sent an email to Mora on October 24, 2006. (Plaintiff's Exhibit 4: the "October 24th Email.") It stated: "Please inform Henry [Berliner] that I want the business loan for my business Butterfly Life and I certify that the funds will be used for increasing my business adventure." There was no evidence to show that the October 24th Email ever went into Exclusive's file or that it was reviewed by Exclusive.

The Loan was to be funded by Exclusive. The structure of the Loan was the subject of a somewhat cryptic email from Mora to Tacy dated October 27, 2006. (Plaintiff's Exhibit 6: the "October 27th Email.") In summary, it would be a "business loan" secured by a second deed of trust against the Residence. The face amount of the Loan would be $165,000. Out of that, the Andersens only received $75,000. Exclusive would receive a $75,000 "flat fee." Mora and Berliner received a "loan fee" in the amount of $9,000. If Butterfly Life was not "thriving" after 90 days, Mora promised to "straw buy" the Residence or refinance it again for an additional $150,000 to $200,000 to give the business "one more try." In the event

---

[3]Mora apparently worked for Berliner. The evidence suggests that Exclusive dealt solely with Berliner, and that Tacy communicated almost exclusively with Mora. Neither Berliner nor Mora testified at trial.

of a refinance, Mora and Berliner would keep an additional $50,000 and the Andersens would receive the balance.

The Loan was to be funded through an escrow. A "Straight Note" was prepared by the escrow company showing a loan for $165,000 all due in six months with interest payable at the rate of 15% per annum. (Plaintiff's Exhibit 9.) But once the escrow was opened, Berliner prepared a handwritten escrow addendum to document the general terms set forth in the October 27th Email (the "Escrow Addendum").[4] The terms of the Loan, as supplemented by the Escrow Addendum, may be summarized as follows: Tacy received $75,000 as *a business loan.* Tacy agreed to execute a note and deed of trust in the amount of $165,000 and to repay that amount in 180 days from a refinance of the Residence. Tacy agreed to pay interest on $90,000, which included the $75,000 she received plus the $9,000 fee to Mora and Berliner. Exclusive would retain $75,000 as a fee. If Tacy was unable to qualify for a refinance loan to pay the full $165,000, she agreed to sell the Residence securing the loan. The terms of the Escrow Addendum were not incorporated into the promissory note or the trust deed against the Residence.

On November 8, 2006, Mora personally financed an "advance" to the Loan in the amount of $15,000 to satisfy an emergency request by Tacy for money. The funds were deposited into the Andersens' personal checking account. (Plaintiff's Exhibit 21.) There was no evidence to show that this advance was conditioned on "business use." The evidence (copies of bank statements) is inconclusive as to how these funds were actually used. (*See* footnote 6, *infra.*)

In late November 2006, the Escrow was ready to close. Before the Loan was

---

[4]The Escrow Addendum was handwritten by Berliner at the escrow company's office because Berliner told Tacy that his computer software was not working. The Escrow Addendum was not signed by Exclusive and was not admitted into evidence. However, Tacy testified in detail as to the terms of the Escrow Addendum, which were consistent with the October 27th Email from Mora and the Loan documents themselves. Mountaineer did not dispute the existence of the Escrow Addendum.

funded, Mora told Tacy that he also needed a written loan application to complete the Loan package. Tacy used an old "Uniform Residential Loan Application" form which had been prepared in connection with a prior effort to obtain financing. (Plaintiff's Exhibit 11: the "Loan Application.") It is undisputed that the Loan Application contained materially false statements regarding, *inter alia*, the Andersens' debts, and their employment and income status.[5] Mora told Tacy that he just needed the basic information in the Loan Application. According to Tacy, Mora knew the other information in the Loan Application was incorrect. The Andersens both signed the Loan Application on November 18, 2006, and it was faxed to Berliner on November 20, 2006.

The next day, November 21st, the escrow closed and funds in the amount of $60,000 ($75,000 less the initial $15,000 advance from Mora) were wire-transferred into the Andersens' *personal bank account* on November 22nd. That same day, the Andersens transferred $40,000 to another personal bank account. Over the next few days, $20,000 of that money was transferred to two other bank accounts. (Plaintiff's Exhibit 21.) The bank statements are inconclusive as to how much, if any, of the Loan proceeds were used to pay expenses of the Butterfly Life business.[6] Two

---

[5]The Loan Application falsely stated, *inter alia*, that Mr. Andersen and Tacy had a combined personal income of $24,700 per month and household expenses of $4,702. They represented their assets to be in excess of $1.5 million and net worth to exceed $840,000. In contrast, Tacy's first bankruptcy petition filed on December 5, 2006, showed assets worth approximately $1.0 million, and liabilities totaling $993,264, combined personal income totaling $14,800 (including Tacy's business income) and monthly expenses totaling $14,675 (including business expenses).

Tacy testified that the Loan Application was actually prepared by a third party in connection with a prior unsuccessful effort to get a loan. Tacy failed to explain why she signed and published a document that was so patently false.

[6]At that time, the Andersens maintained at least three accounts in their personal names with Bank of America. The evidence does not show if a separate business account was maintained for Butterfly Life, or if the business banking was done through the Andersens'

weeks later, Tacy (as Tacy Gould) personally filed a petition for relief under chapter 13 of the Bankruptcy Code (case number 06-12151).   However, at the time Mr. Andersen had serious health problems and Tacy was unable to negotiate an arrangement with the landlord for Butterfly Life.  Tacy realized that the business would have to close and the case was eventually dismissed.[7]

The CEO of Exclusive was Stewart Williams ("Williams").  Williams testified that Exclusive dealt solely with real property secured business loans. Exclusive used Berliner as an agent to locate and package new loan transactions. Williams testified that Berliner worked as an independent "broker" and was not directly employed by Exclusive.  Berliner was not an investor in Exclusive. Williams relied solely on Berliner to package and close the Andersens' Loan.

Williams testified that Exclusive only did "business loans" and he asked Berliner for assurance that the Andersens' Loan was a "business loan."  Berliner told Williams that he had done a credit background search on the Andersens and that the Andersens' "credit looked good."  He also told Williams,  "you're going to make a lot of money on this one."  At one point, Berliner told Tacy that the Loan had been approved by a "committee" at Exclusive, but there was no other evidence to show what procedures, if any, Exclusive employed to review and approve the Loan.   Williams understood that Exclusive would make $75,000 on the Loan.  In addition, Berliner agreed to "kickback" some of his broker's commission to Exclusive's partners.

Neither Williams nor anyone else from Exclusive had any contact with the

---

personal accounts.

[7]Mr. Andersen did not join Tacy in the first bankruptcy filing.  Tacy could not confirm a chapter 13 plan and her case was dismissed in April 2007.  A year later, both of the Andersens filed a second bankruptcy petition under chapter 13 on April 8, 2008, one day before Mountaineer's scheduled foreclosure (case number 08-11955).  That case was dismissed for failure to file complete schedules in May 2008.  This is the third bankruptcy petition relating to the Residence; it was filed on June 26, 2008.

1  Andersens prior to closure of the escrow. Williams relied solely on Berliner to "put

2  the thing together." Williams told Berliner to get the Loan Application because "his

3  partners insisted." However, neither Williams nor anyone from Exclusive ever

4  looked at the Andersens' Loan Application. Williams delegated that responsibility

5  to Berliner, to verify the Andersens' "ability to pay" the Loan. No one from

6  Exclusive ever reviewed the Loan documents before the escrow closed and Berliner

7  never told Williams about the "refinancing/sale" term he had negotiated with Tacy

8  as set forth in the October 27th Email and the Escrow Addendum. Williams testified

9  that he first found the Escrow Addendum in the file after Exclusive sold the Loan to

10  Mountaineer. He described the discovery as "distressing."

11         After Tacy's first bankruptcy was filed, in February 2007, Exclusive sold the

12  Loan to Mountaineer for an undisclosed amount. Exclusive did not provide

13  Mountaineer with a copy of the October 27th Email, or the Escrow Addendum

14  showing that the Loan was to be repaid from a refinance or sale of the Residence.

15  The Andersens never made any payments to Mountaineer, and they were unable to

16  refinance or sell the Residence after the bankruptcy was filed. Mountaineer was not

17  aware of the "refinancing" term until Mountaineer's account officer, Bobbi

18  Jamison, contacted Tacy regarding a default in the Loan. Tacy provided a copy of

19  the Escrow Addendum to Ms. Jamison.

20         In September 2008, this court granted relief from the automatic stay to the

21  secured creditor with a senior lien against the Residence, Accredited Home Lenders.

22  Mountaineer did not enter a bid at the foreclosure sale or take any action to protect

23  its collateral. Its lien was foreclosed and Mountaineer is now a "sold-out"

24  unsecured creditor. Mountaineer seeks a judgment against the Andersens in the

25  amount of $196,890 (the face amount of the Loan plus accrued interest).

26  Mountaineer also seeks a determination that the debt is nondischargeable based on

27  actual fraud and use of the materially false Loan Application.

28  / / /

7

**Issues Presented.**

Mountaineer's complaint pleads three claims for relief summarized as follows:

> That the Andersens fraudulently concealed their intention to file bankruptcy shortly after the Loan was funded;

> That the Andersens entered into the Loan transaction with no intention to ever repay the money, having filed for bankruptcy protection two weeks later; and

> That the Andersens obtained the Loan with a materially false Loan Application;

In its closing argument, Mountaineer raised an additional issue:

> That the Andersens fraudulently represented the Loan to be a business loan, but instead used the Loan proceeds for personal purposes.

In defense, the Andersens contend that:

> The bankruptcy was filed to protect the Butterfly Life business when Tacy realized that the Loan proceeds were insufficient to meet the business needs;

> The Loan was always to be repaid from a sale or refinance of the Residence, and could not have been paid from personal income or any other source;

> Berliner knew the Loan Application contained false financial information when Tacy provided it; and

> Exclusive never reviewed or relied on the information in the Loan Application.

Restated in terms of the Bankruptcy Code, the issues before the court are:

> (1) Did the Andersens obtain the Loan from Exclusive through actual fraud such that the debt is nondischargeable under § 523(a)(2)(A)?

> (2) Is the Andersens' debt to Mountaineer nondischargeable pursuant to § 523(a)(2)(B) based on the use of a materially false written statement regarding their financial condition?

**Applicable Law.**

**Section 523(a)(2)(A).**

Section 523(a)(2)(A) excepts from discharge any debt for money, property, services . . . to the extent obtained by false pretenses, a false representation, or

actual fraud, other than a statement respecting the debtor's . . . financial condition. A creditor must prove five elements by a preponderance of the evidence in order to establish that a debt is nondischargeable under § 523(a)(2)(A):

> (1) that the debtor made a false representation to the creditor;
>
> (2) that the debtor knew the representation was false at the time;
>
> (3) that the debtor intended to deceive the creditor;
>
> (4) that the creditor justifiably relied on the false representation; and
>
> (5) that the creditor sustained loss or damage as a proximate result of the representation having been made.

*Citibank v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996) (citations omitted).

The statutory exceptions to discharge are strictly construed against the objecting creditor and liberally construed in favor of the debtor. 4 *Collier on Bankruptcy* (15th Ed. Revised) ¶ 523.05 at 523-24.

Mountaineer had the burden of proof as to each element of fraud by a preponderance of the evidence. *In re Eashai*, 87 F.3d at 1086-87 (citing *Grogan v. Garner*, 498 U.S. 279, 290, 1115 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991)).

In the case of a debt that has been assigned from the initial lender, the present assignee of the claim must prove, *inter alia*, that the initial lender reasonably relied on the debtor's material misrepresentation. *New Falls Corporation v. Boyajian (In re Boyajian)*, 367 B.R. 138, 146-49 (9th Cir. BAP 2007). This means that Mountaineer must prove that Exclusive relied upon false representations made by the Andersens.

Promise Without Intent to Perform. The first issue is Mountaineer's contention that the Andersens misrepresented both their intention to repay the Loan, Tacy having instead filed for bankruptcy protection, and their intention to use the Loan proceeds for business purposes. The problem with Mountaineer's argument

1    here is two-fold.  First, the Andersens never promised to repay the Loan personally.

2    The Loan was all due in 180 days and it was structured for repayment through a

3    refinance or sale of the Residence.  The Andersens only received less than one-half

4    of the face amount of the Loan.  It is illogical to expect that the Andersens could

5    generate enough personal income to repay the entire Loan, more than two times the

6    amount actually borrowed, in 180 days.  Even the Loan Application, which Tacy

7    admits materially exaggerated the Andersens' income, did not suggest that the

8    Andersens could generate enough income to repay the Loan in six months.

9          Exclusive was to receive $75,000 for funding the Loan.  Exclusive was

10   focused on making "a lot of money" as promised by Berliner.  Exclusive's agents,

11   Berliner and Mora, promised in the October 27th Email and Escrow Addendum to

12   help the Andersens refinance or sell the Residence, which they failed to do.  During

13   the course of the trial, Mountaineer did not introduce any evidence to show that the

14   Andersens were planning to file bankruptcy prior to disbursement of the Loan

15   proceeds.  Indeed, Tacy testified that she only resorted to bankruptcy after making a

16   determination that the Loan proceeds would be inadequate to save her business.

17         Even if the Andersens had made an affirmative representation or promise not

18   to file bankruptcy, it would be difficult to find that Exclusive relied on that

19   representation based on the "eye-popping" return for Exclusive (200% per annum),

20   calculated into the Loan package.  The terms of the Loan support an inference that

21   Exclusive knew of "red flags" in the Andersens' financial history.  *Cashco*

22   *Financial Services, Inc. v. McGee (In re McGee)*, 359 B.R. 764, 775 (9th Cir. BAP

23   2006).  *Cf. Anastas v. Am. Savs. Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir.

24   1996).

25         Second, there is no evidence to show that Exclusive inquired, or even cared,

26   how the Loan proceeds would be used other than Mora's request for assurance as

27   stated in the October 24th Email.  As noted above, there is no evidence to support a

28   finding that the October 24th Email ever went into Exclusive's file or that it was

1  actually reviewed by Exclusive.  Exclusive never questioned the fact that the

2  Andersens submitted a *residential* Loan Application with almost no information

3  about the financial condition of Butterfly Life.  Exclusive never questioned the fact

4  that the Loan proceeds were wire-transferred into the Andersens' *personal* bank

5  account.

6       Intent to Deceive and Reliance.  Mountaineer also contends that the

7  Andersens intended to deceive Exclusive and that Exclusive funded the Loan in

8  reliance of the Andersens' representations.  Generally, "[t]he debtor's knowledge

9  and fraudulent intent may be shown by circumstantial evidence and inferred from

10  the debtor's course of conduct." *Leonard v. Guillory (In re Guillory)*, 285 B.R. 307,

11  312-13 (Bankr. C.D. Cal. 2002). *Cf. Tallant v. Kaufman (In re Tallant)*, 218 B.R.

12  58, 66 (9th Cir. BAP 1998) (additional citations omitted).

13       Unfortunately, there is a dearth of evidence to support either of these critical

14  elements of the case.  The Andersens agreed with Berliner and Mora, and always

15  understood, that the Loan would be repaid from a refinance or sale of their

16  Residence.  Nothing about that was deceitful.  However, Exclusive apparently did

17  not get the "full story" from Berliner.  Berliner knew that the Loan Application

18  contained false information when he provided it to Exclusive.  Exclusive was only

19  focused on making a $75,000 profit once the Residence was refinanced or sold, in

20  180 days.  Exclusive did not review the Loan Application or rely on anything except

21  Berliner's promises that (1) the Andersens had "good credit," and (2) Exclusive

22  would make a "lot of money" on the deal.  Berliner worked for Exclusive, not the

23  Andersens.  Berliner and Mora made $9,000 once the escrow closed.  They had a

24  personal financial incentive to "sell the deal" to Exclusive.  The court is not

25  persuaded that the Andersens made any representations with an intent to deceive

26  Exclusive, or that Exclusive relied on anything the Andersens did represent with

27  regard to the Loan.

28  / / /

11

**Section 523(a)(2)(B).**

Mountaineer's second claim is under § 523(a)(2)(B), which excepts from a discharge of any debt, "(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– . . . (B) use of a statement in writing– (I) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) *on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied;* and (iv) that the debtor caused to be made or published with intent to deceive." Emphasis added. Again, for the purposes of reliance, the relevant creditor is Exclusive, the creditor that originally made the Loan. *In re Boyajian*, 367 B.R. at 146-49.

Mountaineer contends that the Loan Application was materially false and misleading in numerous respects. In that regard, Tacy admitted at trial that the Loan Application was materially false. She testified that the Loan Application was prepared by someone else in conjunction with a prior unsuccessful effort to obtain financing. The fact that the Andersens may not have actually prepared the Loan Application does not exonerate them from responsibility for its content; they did sign it and publish it for use by Exclusive. When there is evidence of materially fraudulent information in a written financial statement, little investigation is required for a creditor to have reasonably relied on the representations. *Gertsch v. Johnson & Johnson, Finance Corporation (In re Gertsch)*, 237 B.R. 160, 170 (9th Cir. BAP 1999) (citations omitted).

The problem with Mountaineer's case is that Exclusive never conducted any investigation of the information in the Loan Application. Indeed, it did not even review or consider the Loan Application before funding the Loan and closing the escrow. Exclusive may have delegated that responsibility to Berliner, but there was no evidence to suggest that he reviewed or considered the Loan Application either. According to Tacy, Berliner actually knew the Loan Application had serious problems. Exclusive merely needed a loan application to complete its file. The

1  escrow closed one day after Berliner received the Loan Application.  Exclusive was

2  looking at a short term loan which would return a 100% profit once the Residence

3  was refinanced or sold.  It did not matter what the Loan Application said regarding

4  the Andersens' employment and income history if Exclusive had no intention of

5  reading and relying on that document.  Mountaineer failed to prove the "reasonable

6  reliance" element of its § 523(a)(2)(B) claim.

7  **Conclusion.**

8       Based on the foregoing, the court finds and concludes that the Loan was

9  structured for repayment from a future refinance or sale of the Residence and not

10  from the Andersens' personal income or business operations.  The Andersens never

11  represented that they had the ability to pay the face amount of the Loan only 180

12  days after it was funded.  Mountaineer's predecessor, Exclusive Investments Ltd.,

13  funded the Loan with the expectation of making a 100% profit in 180 days.  The use

14  of the Loan proceeds, business or personal, was immaterial to Exclusive when it

15  funded the Loan.  The court is not persuaded that the Andersens intended to deceive

16  Exclusive, or that Exclusive relied upon anything stated in the Andersens' Loan

17  Application, or on any representation, actual or implied, made by the Andersens in

18  connection with the Loan.  Mountaineer has failed to prove two essential elements

19  of its fraud claims; intent to deceive and reliance.  Accordingly, judgment will be

20  entered in favor of the Andersens.

21       Dated: September ___23___, 2009

22

23

24  W. Richard Lee
    United States Bankruptcy Judge

25

26

27

28

13